UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| MARVIN GARRETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  1:14 CV 73 JMB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves Applications for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income under Title XVI of the Act.  Plaintiff has filed a

Brief in Support of his Complaint, and the Commissioner has filed a Brief in Support of her

Answer.  Plaintiff filed a Reply thereto.  The parties consented to the jurisdiction of the

undersigned pursuant to 28 U.S.C. § 636(c).

**I.**     **Procedural History**

On November 17, 2011, Plaintiff Marvin Garrett filed Applications for Disability

Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. and Supplemental Security

Income pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et. seq. (Tr. 168-

83)[1]  Plaintiff stated that his disability began on April 30, 2008, as a result of asthma, COPD,

psychiatric disorder, severe back problems, drug addiction, and memory problems.  On initial

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 11/filed August 22, 2014).

consideration, the Social Security Administration denied Plaintiff's claims for benefits.  (Tr. 108-51)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  On April 22, 2013, a hearing was held before an ALJ.  (Tr. 48-81)  Plaintiff testified and was represented by counsel.  (Id.)  Vocational Expert Dr. Leslie F. Lloyd also testified at the hearing.  (Tr. 73-80, 128-31)  Thereafter, on May 22, 2013, the ALJ issued a decision denying Plaintiff's claims for benefits.  (Tr. 11-35)  After considering the representative's brief and the treatment records from Southeast Hospital, dated February 25 through October 2, 2013, the Appeals Council found no basis for changing the ALJ's decision and denied Plaintiff's request for review on April 21, 2014.  (Tr. 1-5, 8-9, 312-13)[2]  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

---

[2]After the unfavorable ALJ determination, Plaintiff submitted evidence to the Appeals Council demonstrating that he had received treatment in the emergency room at Southeast Hospital beginning on February 26 through October 2, 2013, for anxiety/panic attacks, chest tightness, dyspnea, and wheezing and for medication refills.  (Tr. 1614-1768)  New evidence submitted to the Appeals Council is considered only to the extent it "relates to the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. §§ 404.970(b), 416.1470(b).  The undersigned interprets the Appeals Council's statement that the additional evidence did not provide a basis for changing the ALJ's decision as a finding that the new medical evidence submitted was not material.  See Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000) (whether additional evidence meets criteria is question of law; to be material, evidence must be relevant to claimant's condition for time period for which benefits were denied, and must not merely detail after-acquired conditions or post-decision deterioration of pre-existing condition).  To the extent that these records suggest that Plaintiff's conditions worsened after May 22, 2013, Plaintiff's recourse is to file a new application for benefits.  See, e.g., Tarwater v. Astrue, 4:10cv1974 LMB, 2012 WL 381783, at *18 (Feb. 6, 2012) (finding substantial evidence supported the Commissioner's decision despite the existence of treatment notes dated shortly after the ALJ's decision suggesting that Plaintiff's mental condition worsened and noting plaintiff's recourse is to file a new application for benefits).

## II.    Evidence Before the ALJ

### A.    Hearing on April 25, 2013

#### 1.    Plaintiff's Testimony

At the hearing on April 25, 2013, Plaintiff testified in response to questions posed by the ALJ and counsel.  (Tr. 50-73)  Plaintiff received his GED in 2009 while he was incarcerated.  (Tr. 54)  Plaintiff stands at six feet one inch and weights two hundred thirty pounds.  (Tr. 55)  Plaintiff stated that he gained weight because his asthma, COPD, breathing problems, and bronchitis prevent him from being as active as he used to be.  (Tr. 55)  Plaintiff admitted that he has a past drug history and is a recovering alcoholic.  (Tr. 56-57)

Plaintiff last worked as a cashier in October 2008 when he was fired after being accused of stealing from his employer.  (Tr. 56)  Plaintiff did not return to work, but he helped his father recover from a serious automobile accident.  Plaintiff testified that he has not returned to work because he had a problem with pain medications and arm pain.  (Tr. 56-57)  While helping lift a friend in a wheelchair, Plaintiff injured his back.  (Tr. 57)  For ten years, Plaintiff worked as a certified nurse aide, and his job duties included lifting residents.  (Tr. 57)  Plaintiff testified that he also had worked as a forklift driver and a cashier.  (Tr. 74)  As a cashier, Plaintiff had to stock shelves lifting items weighing fifteen to twenty pounds and clean.  (Tr. 75)

After he broke his arm, Plaintiff started experiencing right arm pain.  Plaintiff testified that he chooses not to take pain medications because of his past drug history.  (Tr. 57)  Plaintiff testified that over the last five years his back pain has become worse, and he has had to live with the pain because of his pain pill addiction.  (Tr. 59)  Plaintiff does physical therapy and exercises to help reduce his pain.  (Tr. 59)  Plaintiff stated that he started receiving treatment once a week

with a psychiatrist at the Community Counseling Center for his panic attacks and depression six months earlier.[3]  (Tr. 64, 68)  Plaintiff testified that his depression makes him unsociable.  (Tr. 66)  Plaintiff only socializes with his father and his son.  (Tr. 66)  Plaintiff testified that an emergency room doctor prescribed Ativan for his panic attacks, but he is currently not taking any medications for his depression or panic attacks.  (Tr. 70, 72)

Plaintiff testified that he experiences shortness of breath, and he has problems keeping his oxygen level up.  (Tr. 62)  Plaintiff testified that his asthma causes him to experience panic attacks.  (Tr. 62)  Combivent Albuterol is the only medication that helps Plaintiff's breathing.  (Tr. 63)  Plaintiff testified that using a nebulizer machine helps with his breathing.  (Tr. 63)

Plaintiff's right arm pain causes problems when he lifts things.  (Tr. 58)  Plaintiff testified that he can lift two to three pounds with that arm.  (Tr. 58)  Plaintiff's back pain prevents him from sitting more than fifteen minutes, because he starts experiencing pain running down his left leg.  (Tr. 60)  Plaintiff indicated that he can walk about a half a block, but then he has to sit down.  (Tr. 60)  Alternating between sitting and standing helps Plaintiff deal with his pain.  (Tr. 61)  Plaintiff testified that he has to lie down six to ten times a day for fifteen to twenty minutes at a time to ease his pain.  (Tr. 61)

Since his father cannot do any housework, run the vacuum cleaner, or cook, Plaintiff testified that he has to take care of those activities.  (Tr. 62)  Plaintiff testified that he reads and watches television during the day.  (Tr. 66)

---

[3]The ALJ noted that the last treatment note from the Community Counseling Center was dated October 2012.  (Tr. 69)  Plaintiff then testified that he was receiving treatment at Community Based Solutions, a related facility to the Community Counseling Center.  (Tr. 70)  Plaintiff explained that doctors could not prescribe any kind of narcotics such as Ativan or Benzodiazepines because of his methadone dosage.  (Tr. 71)

## 2. Testimony of Vocational Expert

Vocational Expert Dr. Leslie Lloyd testified at the hearing.  (Tr. 73-80)  The VE characterized Plaintiff's vocational background to include work experience as a cashier, a semiskilled job with a light exertional level, and a forklift operator, a semiskilled job with a medium exertional level.  (Tr. 75)

The ALJ asked the VE to assume someone similar to Plaintiff in age, education, and work experience who is limited to light work activity with the additional limitations that this individual should avoid concentrated exposure to temperature extremes, humidity, strong odors, fumes, dust, chemicals or other respiratory irritants.  (Tr. 76)  Further, the hypothetical individual should not work around hazards such as unprotected heights or around dangerous or moving machinery, and should only occasionally climb stairs, ladders, ropes, or scaffolds.  The ALJ also limited the hypothetical individual to simple, routine, and repetitive tasks, and not performing tasks requiring  more than superficial interaction with the public or coworkers.  (Tr. 76)  The VE noted that such individual would not be able to perform Plaintiff's past work, but such individual could perform jobs like a laundry worker, a mail clerk, and an assembler of small parts.  All of the jobs listed were unskilled with a light exertional level.  (Tr. 76-77)

In response to a question by Plaintiff's counsel regarding the type of breaks given and spaced out throughout the day, the VE explained that breaks are given after a two hour period and are typically ten to fifteen minutes in duration for the morning and afternoon break, and thirty minutes for lunch.  (Tr. 77)  When asked if the hypothetical individual would require an extra fifteen minute break due to health, the VE noted the jobs he cited would not permit this additional break.  (Tr. 78)  With respect to pace, the VE noted that the laundry worker and mail

clerk jobs were relatively slow to medium paced jobs whereas the assembler job was more fast paced.  The VE explained that a person in those jobs is required to stay on task and maintain pace for at least ninety percent of the day.  (Tr. 78)  When asked if the jobs would permit a worker an option to change between sitting and standing every twenty to thirty minutes throughout the day due to physical impairments, the VE responded no.  (Tr. 79)  Next, counsel asked the VE to include a limitation that the individual could frequently lift and handle with his right upper extremity and unlimited in his left upper extremity.  The VE indicated that such individual could perform the laundry worker and mail clerk jobs but not the assembler job.  If the frequency of lifting and handling with his upper right extremity was lowered to occasional, the VE indicated that the mail clerk position would not remain, and the laundry worker position might remain, depending on whether or not the individual could use the right upper extremity to assist the left hand on occasion.  (Tr. 80)

## III.    Medical Records and Other Records

### A.    General History

The medical evidence in the record shows that Plaintiff has a history of asthma, chronic obstructive pulmonary disease, degenerative disc disease of the thoracic and lumbar spines, osteoarthritis of the right shoulder, depression, panic disorder, and substance abuse.  (Tr. 314-1768)  Although the Court has carefully considered all of the evidence in the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, only the medical records relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are discussed.

To obtain disability insurance benefits, a claimant must establish that he was disabled

within the meaning of the Social Security Act not later than the date his insured status expired, in this case December 31, 2012. Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) ("In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status."); see also 42 U.S.C. §§ 416(I) and 423(c); 20 C.F.R. § 404.131.


**B.    Department of Corrections Treatment Records** (Tr. 314-347)

Between August 20 and December 16, 2009, Plaintiff received medical treatment while incarcerated. As part of plea agreement for a DWI, Plaintiff served 120 days in a treatment program at the Missouri Department of Corrections.

**C.    Saint Francis Medical Center Treatment Records** (Tr. 354-569, 1414-1551)

From June 3, 2008, through August 5, 2012, Plaintiff presented in the emergency room at St. Francis Medical Center on numerous occasions for treatment.

On June 3 and 4, 2008, Plaintiff sought treatment for rib pain he started experiencing while moving furniture. The emergency room ("ER") doctor prescribed Ultram. An x-ray showed fractured anterior aspect of Plaintiff's right eighth rib without underlying right lung contusion or pneumothorax.

On January 26, 2009, Plaintiff presented, complaining of ongoing chest pain. Dr. David Law prescribed an Aspirin, Zofran, and Ativan and administered Morphine Sulfate after admission to St. Francis Medical Center. A cardiolite stress test showed normal results. Dr. Law prescribed Zoloft and referred Plaintiff to Dr. Mark Kinder for evaluation. Dr. Law made a diagnosis of non cardiac type chest pain.

Plaintiff reported having bilateral, lower back pain, decreased range of motion, and back

tenderness on March 30, 2009.  Plaintiff reported that he tripped in a hole while playing with his children.  The ER doctor prescribed Demerol, Flexeril, and Hydrochloride.  An x-ray showed normal lumbar lordosis without spondylolisthesis, no acute fracture, and minimal discogenic disease.

On April 22, 2009, Plaintiff presented complaining of back pain after tripping and falling over carpet.  The ER doctor administered Morphine Sulfate and prescribed Prednisone and Vicodin.

On May 8, 2009, Plaintiff sought treatment for low back pain.  A recent CT of Plaintiff's lower spine was unremarkable.  Plaintiff reported having increased pain after lifting objects around the house. The ER doctor administered a Ketorolac Tromethamine injection.

On May 19, 2009, Plaintiff presented in the emergency room complaining of chest pain. Plaintiff received Aspirin and Nitroglycerin.

On May 21, 2009, Dr. Law examined Plaintiff and performed a coronary angiogrpahy to evaluate Plaintiff's chest pain.  Dr. Law strongly counseled Plaintiff again regarding his smoking cessation.  After the procedure, Dr. Law found Plaintiff to have mild coronary disease and normal left ventricular systolic function.  Plaintiff received treatment on May 23 and 26, 2009, for pain at the site of the recent angiogram and was diagnosed with post operative pain.  Plaintiff reported being out of Percocet.

On June 26, 2009, Plaintiff presented complaining of right eye pain.

On March 18, 2010, Plaintiff received treatment after hitting his foot on a coffee table and being unable to bear weight on the foot.  An x-ray showed an oblique oriented fracture midshaft proximal phalanx third right digit.

On April 24, 2010, Plaintiff presented complaining of back pain starting after he lifted someone. An x-ray showed vertebral body heights and disc spaces appeared well maintained and vertebral alignment to be satisfactory. Lower back pain was the final diagnosis.

Plaintiff sought treatment in the emergency room on May 16, 2010, after injuring his back while transferring a friend from a wheelchair to the commode. Examination showed midline tenderness. The doctor administered a Ketorolac Tromethamine injection and prescribed a medication regimen. On June 28, 2010, Plaintiff presented complaining of low back pain after moving a washing machine. Plaintiff received medications including Valium. At that time, Plaintiff denied impaired mobility and reported being able to ambulate normally.

Plaintiff sought treatment on July 29, 2010, for a back injury which occurred while he helped move a couch. The ER doctor prescribed Ibuprofen and Ultram. On August 30 2010, Plaintiff presented for treatment after falling down the steps and injuring his back. Examination showed mild tenderness in his lower back area. An x-ray showed no bony abnormality.

On December 4 and 5, 2010, Plaintiff received treatment for swelling of his eye and a skin infection.

On December 25, 2010, Plaintiff reported falling down six stairs and landing on his back. The ER doctor prescribed Dilaudid and Zofran. A CT scan showed no fracture or subluxation and a mild depression of the superior endplate of his L1 vertebra. An x-ray showed minor endplate degenerative changes in Plaintiff's lower thoracic spine. The ER doctor found this probably evidenced degenerative change or change from remote trauma. The ER doctor prescribed Flexeril and Percocet.

Plaintiff sought treatment on January 9 and 10, 2011, for right lower back pain which

started after he fell onto a hard surface. The ER doctor administered a Ketorolac Tromethamine injection. The ER doctor refused to provide a prescription for any narcotics. On July 16, 2011, Plaintiff presented complaining of low back pain and thoracic-lumbar pain after moving a couch. The ER doctor prescribed Percocet and noted drug seeking behavior.

On February 9, 2012, Plaintiff presented complaining of low back pain. An x-ray of Plaintiff's lumbar spined showed no fracture, no subluxation, no bony lesion, and no spondylolysis.

During treatment on March 16, 2012, the ER doctor diagnosed Plaintiff with pneumonia, unspecified, bronchospasm, and prescribed medications. An x-ray showed calcified granulomas in both lungs.

Plaintiff presented on April 2, 2012, after reportedly falling down the stairs and injuring his back. An x-ray showed no acute fracture or dislocation. The ER doctor prescribed Percocet, Robaxin, and Medrol Dosepak.

On April 14, 2012, Plaintiff requested treatment for a toothache and received a prescription for Percocet. On May 28, 2012, Plaintiff presented in the emergency room, but he left before he was treated. On June 2, 2012, Plaintiff presented seeking treatment for a toothache. The doctor administered a morphine sulfate. Plaintiff requested a narcotic for his pain. On June 5, 2012, Plaintiff returned seeking additional treatment. When the ER doctor offered to prescribe non-narcotic pain medication, Plaintiff stated "forget it, I'm leaving." (Tr. 1445) The nurse observed Plaintiff to leave ambulatory with a quick gait as he eloped without receiving the care offered.

On August 5, 2012, Plaintiff returned seeking treatment for back pain and reported

having a pinched nerve in his lower back.  The ER doctor prescribed Percocet as needed for pain.  On August 30, 2012, Plaintiff returned complaining of right arm pain and reported working in the yard.  The doctor prescribe Percocet and Robaxin.

      **D.**      **Southeast Missouri Hospital Treatment Records** (Tr. 594-996, 1002-1190, 1210-1412)

From April 28, 2010, through February 14, 2013, Plaintiff presented in the emergency room at Southeast Missouri Hospital on numerous occasions for treatment.

On April 28, 2010, Plaintiff presented complaining of lower back pain.  Examination showed paraspinal tenderness in Plaintiff's lower back.  The ER doctor prescribed Vicodin and Flexeril.  Plaintiff returned on April 30, 2010, complaining of continued back pain and muscle spasms.  Plaintiff reported feeling better after receiving a Ketorolac Tromethamine injection and Valium.  A CT scan of Plaintiff's lumbar spine showed no acute fracture or dislocation, spondylolysis L5 on the left side, and minimal narrowing of right neural foramen L5-S1.

On May 3, 2010, Plaintiff presented complaining of low back pain and reported running out of narcotic pain medications for his back pain and being unable to schedule follow-up treatment for a couple of weeks.  Plaintiff indicated that he had an appointment with Dr. Sandvos, but when the nurse called to confirm, the office indicated that Plaintiff did not have a scheduled appointment.  The ER doctor administered a Ketorolac Tromethamine injection. Plaintiff returned on May 5, 2010, and reported that he had depleted his medications.  Plaintiff claimed he could not see his primary care physician for another two weeks.  Plaintiff reported injuring his back when he lifted his 350 pound roommate.

Plaintiff sought treatment for low back pain on May 6, 2010.  The ER doctor noted that Plaintiff had been treated numerous times for the same symptoms, and claimed that his primary

care physician is out of town.  Plaintiff requested more Percocet tablets even though he had received thirty tablets the day before for his chronic back pain.  The ER doctor noted that Plaintiff met a new friend in the lobby and stepped outside to smoke together.  The ER doctor explained to Plaintiff that he would not likely receive any prescriptions for narcotics from the emergency room in the future for his low back pain.  On May 8, 2010, Plaintiff presented complaining of low back pain, a recent back injury, and being prescribed Percocet with no relief.  The ER doctor noted Plaintiff's multiple visits to the emergency room with prescriptions for narcotics given.  A drug screen test showed multiple positives, including cocaine.  The ER doctor noted that he would be "extremely cautious in prescribing narcotics to this patient in the future."  (Tr. 956)  Plaintiff eloped from the emergency room without notifying the staff of his intent to leave, and without receiving his medications.

On May 30, 2010, Plaintiff presented complaining of a cough and chest discomfort.  Plaintiff stated that he has asthma that is easily treated with an inhaler and a nebulizer.  A chest x-ray showed no evidence of pulmonary embolus or active pulmonary disease, and benign granulomatous changes.

On June 28, 2010, Plaintiff presented complaining of back pain starting after he picked up a refrigerator.  Plaintiff reported breathing better after a drug a nebulizer treatment.  The x-ray showed no acute fracture dislocation of Plaintiff's lumbar spine.

In treatment on August 27, 2010, Plaintiff reported having low back pain caused by lifting a person.  The ER doctor prescribed Valium and Lorcet.  On August 31, 2010, Plaintiff sought treatment for back pain and tenderness.  The record shows Plaintiff injured his back three months earlier, and he had been treated and prescribed Lorcet and Valium.  The ER doctor added

a steroid to Plaintiff's current medication regimen.

On September 12, 2010, Plaintiff presented for treatment. The ER doctor noted that a Walgreen pharmacist indicated that Plaintiff frequently obtained various opiate prescriptions from multiple ER doctors as well as from private physicians in the area. The ER doctor refused to prescribe opiates and encouraged Plaintiff to reduce or stop smoking.

On September 19, 2010, Plaintiff sought treatment for low back pain after falling down the steps. The x-ray showed a normal lower spine series. The ER doctor administered a Ketorolac Tromethamine injection and prescribed Diazepam as treatment of Plaintiff's lumbar strain.

On October 10, 2010, Plaintiff presented for treatment of left foot pain and reported that attending college as his occupation.

Plaintiff received treatment on October 16, 2010, for a cough and wheezing in his chest. The ER doctor found that Plaintiff had bronchitis and exacerbation of asthma and prescribed steroids and Tramadol. Plaintiff returned on October 17, 2010, reporting he was not improving after being diagnosed with bronchitis. The doctor administered a Ketorolac Tromethamine injection and Rocephin through an IV. On October 19, 2010, Plaintiff was discharged from Southeast Missouri Hospital after being treated for acute asthma exacerbation, acute bronchitis, and tobacco abuse. Plaintiff was admitted via the emergency room on October 18 and reported having used his uncle's Combivent inhaler but the inhaler had run out. A radiograph of Plaintiff's chest showed old granulomatous disease and no significant change compared to a prior examination.

On October 26, 2010, Plaintiff sought treatment for a cough, shortness of breath,

diminished breath sounds, and wheezing. A chest x-ray showed chronic obstructive pulmonary disease with benign granulomatous changes. The ER doctor prescribed a drug nebulizer and Prednisone. The doctor's diagnosis listed a history of asthma with recent exacerbation and multiple emergency room visits for pain related complaints, and tobacco dependence. When the ER doctor attempted to discharge Plaintiff, he refused to leave without being prescribed a pain medication.

On December 14, 2010, Plaintiff presented complaining of low back pain after reportedly lifting a piece of steel weighing around ninety pounds. The ER doctor noted that Plaintiff had been in the emergency room for treatment of back pain ten times since April 2010. The ER doctor administered a Ketorolac Tromethamine injection and prescribed Prednisone, Flexeril, and Ultram as treatment of a lumbar strain.

On January 17, 2011, Plaintiff sought treatment for his chest pain, but he left the emergency room without being seen. Plaintiff sought treatment for bilateral back pain on January 30, 2011. Plaintiff reported reinjuring his back when moving a couch. The ER doctor recommended physical therapy and administered a Ketorolac Tromethamine injection.

On February 6 and 28, 2011, Plaintiff presented complaining of chronic low back pain and reported smoking a package of cigarettes a day. The ER doctor prescribed Flexeril, Lorcet, and Prednisone.

Plaintiff received treatment for chest pain, wheezing, and shortness of breath on March 7, 2011. Plaintiff received respiratory therapy and a nebulizer. The ER doctor diagnosed Plaintiff with bronchitis and bronchospasm.

On March 14, 2011, Plaintiff sought treatment for ongoing chest pain. The ER doctor

diagnosed Plaintiff with pleurisy and bronchitis. A x-ray of Plaintiff's chest showed no significant change compared with prior exam. Plaintiff returned complaining of a possible medication reaction because he reportedly experienced a burning pain after taking Tylenol #3. Plaintiff requested a different medication.

On March 27, 2011, Plaintiff presented complaining of back injury and chronic low back pain. The ER doctor prescribed Flexeril and Vicodin. On March 30, 2011, Plaintiff presented complaining of back pain after falling. Plaintiff walked out of the emergency room prior to discharge. The ER doctor observed that Plaintiff was moving without hesitation.

Plaintiff sought treatment on April 14, 2011, for back pain starting a year earlier after lifting a friend out of a wheelchair. Plaintiff reported that Flexeril helped his pain, but he was out of the medication. The doctor refilled Plaintiff's Flexeril prescription and prescribed Percocet. On April 26, 2011, Plaintiff returned for treatment of his back pain after reportedly reinjuring his back. Although Plaintiff reported not receiving treatment since he injured his back six weeks earlier, the ER doctor noted that Plaintiff had been treated on April 14 for the same complaint and reported his back pain being exacerbated after reportedly moving furniture. Examination showed midline tenderness in Plaintiff's lower back area. The ER doctor prescribed Percocet and Flexeril and directed Plaintiff to follow-up with his primary care physician.

On May 22, 2011, Plaintiff sought treatment for right side pain. The ER doctor noted that "[when I entered the room to evaluate this patient he was not there and could not be located. There *forsake*] I did not see this patient during this ED visit." (Tr. 698) Plaintiff reported having back pain after mowing the lawn on May 23, 2011. At discharge, Plaintiff ambulated without

assistance.  The ER doctor administered a Ketorolac Tromethamine injection and prescribed

Prednisone.  On May 30, 2011, Plaintiff reported experiencing back pain after a fall.  The ER

doctor noted that Plaintiff "[w]alked out prior to discharge, observed to be moving without

hesitation."  (Tr.685).  A nurse observed Plaintiff able to ambulate normally.  An x-ray showed

minor chronic anterior wedging of the L1 vertebra unchanged from a lumbar spine CT on

December 25, 2010; mild degenerate spondylosis at T11-12 and T12-L1; and no acute lumbar

spine fracture or subluxation.

On July 1, 2011, Plaintiff sought treatment for a rash covering his entire body.  Plaintiff

received treatment for abscesses on his right leg on July 10 and 15, 2011.  In all three treatment

records, the treating doctors noted that Plaintiff had "been seen here 17 times since June 2010 for

pain related complaints, exhibits drug seeking tendencies."  (Tr. 1084, 1093,1098)

Plaintiff reported experiencing back pain on August 2, 2011, after he reportedly carried a

refrigerator downstairs.  The ER doctor noted that Plaintiff exhibited drug seeking tendencies.

Examination showed minimal paraspinal tenderness in Plaintiff's lower back.  The ER doctor

prescribed Oxycodone Hydrochloride.  On August 17, 2011, Plaintiff reported slipping in the

back of his truck and falling.  The ER doctor observed that although Plaintiff arrived to the

treatment area via a hospital wheelchair, he had a steady gait.  An x-ray of Plaintiff's cervical

spine showed a normal cervical spine series.  Plaintiff returned on August 26, 2011, reporting

continued back pain after reportedly carrying a refrigerator downstairs.  On August 29, 2011,

Plaintiff presented complaining of a sore finger.

On September 12, 2011, Plaintiff sought treatment for back pain after reportedly slipping

on a wet bedliner in the back of a truck and falling flat on his back.  The ER doctor noted that

Plaintiff had "been seen here 17 times since June 2010 for pain related complaints, exhibits drug seeking tendencies." (Tr. 627) An x-ray of Plaintiff's lumbar and cervical spine showed no acute fracture or listhesis. An x-ray of Plaintiff's cervical spine showed mild osseous narrowing of the right C3-4 neural foramen. The ER doctor prescribed Celexa and Trazodone.

On October 4, 2011, Plaintiff presented in the emergency room but left without receiving treatment.

On November 9, 2011, Plaintiff sought treatment for chest pressure and drug withdrawal from Methadone. Plaintiff reported that he stopped taking Methadone that day and was not taking any other medications. Plaintiff was stabilized and discharged to home after being treated. Plaintiff left without his discharge papers. The ER doctor noted that Plaintiff had "been seen here 17 times since June 2010 for pain related complaints, exhibits drug seeking tendencies." (Tr. 1034)

On April 8, 2012, Plaintiff returned seeking an evaluation of his asthma and cough. A back examination showed no tenderness and a normal inspection. Plaintiff received respiratory therapy. The ER doctor continued Plaintiff's medication regimen of Albuterol, Paxil, Seroquel, and Vistaril. On April 26, 2012, Plaintiff reported having a fever and body aches. A chest x-ray showed a subtle increase in the amount of interstitial density in the bases.

On May 15, 2012, Plaintiff presented seeking treatment for his constant cough, bloody sputum, and shortness of breath. Plaintiff was admitted for evaluation and placed on an oxygen protocol for a total of a four day course, and administered drug nebulization treatments for acute respiratory failure. A chest x-ray showed developing left lower lobe pneumonia. A CT of

Plaintiff's pulmonary arteries showed no evidence of pulmonary embolus and scattered pulmonary infiltrates. The treating doctor advised Plaintiff to stop smoking.

During treatment on June 24, 2012, a back examination showed no tenderness to palpation and a normal inspection. An x-ray of Plaintiff's chest showed chronic obstructive pulmonary disease.

On November 20,2012, Plaintiff presented seeking treatment for shortness of breath and wheezing. The ER doctor ordered a drug nebulizer to treat Plaintiff's acute bronchitis. An x-ray of Plaintiff's chest showed no acute cardiopulmonary disease and old granulomatous disease. Plaintiff returned on November 21, 2012, complaining of back pain. A back examination showed no tenderness, a normal inspection, and no pain to percussion. The ER doctor observed Plaintiff's gait to be normal. Plaintiff refused further evaluation including radiology interpretation.

On December 21, 2012, Plaintiff returned seeking treatment for flu-like symptoms. A chest x-ray showed no acute cardiopulmonary disease and old granulomatous disease.

On January 6, 2013, Plaintiff presented complaining of difficulty breathing, but he admitted still smoking and not having an inhaler or breathing treatments even though he had been diagnosed with asthma. Plaintiff reported his breathing normally being well controlled. The ER doctor noted Plaintiff had scattered wheezing present. The ER doctor prescribed a drug nebulizer and a metered dose inhaler. The ER doctor listed bronchopneumnia as Plaintiff's diagnosis. A chest x-ray showed chronic obstructive pulmonary disease with benign granulomatous changes.

On January 13, 2013, Plaintiff received treatment for dyspnea and an asthma attack. An

x-ray showed Plaintiff's lungs remained clear, a calcified granuloma in his left lung base, and no pleural effusions detected. On January 15, 2013, Plaintiff presented complaining of problems breathing. An x-ray of Plaintiff's chest showed hyperexpanded lungs suggesting underlying chronic obstructive pulmonary disease. A back examination showed no tenderness and a normal inspection.

During treatment for body aches on February 10, 2013, the ER doctor found scattered wheezing to be present. Plaintiff reported spending the day with his grandchildren, and that he might have over exerted himself. The ER doctor prescribed Albuterol Sulfate, Doxycycline Hyclate, and Medrol Dosepak as treatment for his bronchitis. On February 14, 2013, Plaintiff presented seeking treatment of oral lesions. The ER doctor noted that although Plaintiff had recently received treated in the emergency room for bronchitis, Plaintiff did not fill his medication, and Plaintiff continues to smoke.

E.      **Community Counseling Center** (Tr. 572-90, 997, 1203-1208, 1587-91)

Plaintiff received treatment at the Community Counseling Center from February 5, 2010, through March 14, 2013.

On February 5, 2010, Dr. Del McKinney evaluated Plaintiff for depression and anxiety. Plaintiff reported being released from the Department of Corrections and being withdrawn from friends and social involvement. Plaintiff reported his stressors were unemployment, inability to find a job, and a lack of finances. Plaintiff reported that his current health was good and he was currently taking medications for pain and infection. After examination, Dr. McKinney diagnosed Plaintiff with generalized anxiety disorder, panic, and major depressive disorder.

On April 21, 2011, Nurse Kantcheva noted that Plaintiff had no previous psychiatric

history and a long history of cannabis abuse and alcohol dependence.  Plaintiff reported not taking any medications.  Dr. Robert McCool prescribed Celexa.

On May 6, 2011, Nurse Kantcheva increased Plaintiff's Celexa dosage.  Plaintiff reported being more depressed and stressed out due to financial problems.  On May 24 and June 15, 2011, Plaintiff reported that he tolerated his medications well and he was looking for a job.

In the September 7, 2011, Psychotherapy note, Nurse Daniela Kantcheva noted that Plaintiff had been noncompliant with his medications, Plaintiff last received treatment in June 2011, and he failed to show up for a scheduled appointment on July 13, 2011.  Dr. McCool prescribed Celexa and restarted Plaintiff's Seroquel prescription.

In a Psychiatric Evaluation dated October 3, 2011, Dr. Kishore Khot diagnosed Plaintiff with panic disorder and prescribed a one month trial of Buspar and continued Plaintiff on Seroquel.

On November 3, 2011, Plaintiff failed to appear for an appointment.  On December 21, 2011, Dr. Khot noted noncompliance due to Plaintiff missing several appointments and that Plaintiff was in methadone treatment with Dr. Lambrou.

On February 21, 2012, Plaintiff reported being irritable.  Dr. Khot increased Plaintiff's Paxil and Seroquel dosages and restarted his Vistaril prescription.  On March 14, 2012, Plaintiff called and reported doing better.  Plaintiff reported continuing to have anxiety since cutting down his methadone dose on April 19, 2012.  Dr. Khot adjusted Plaintiff's medication regimen.

On June 11, 2012, Dr. Khot gave Plaintiff some samples of Seroquel and a prescription refill.  On July 16, 2012, Plaintiff failed to show up for his appointment.  In a call on October 11, 2012, Plaintiff requested Seroquel samples to alleviate his anxiety and panic attacks.  Dr. Khot

told Plaintiff he would have to wait until his appointment on October 18, 2012. Plaintiff failed to show up for that appointment.

In a March 14, 2013, Intake Note, Plaintiff complained of depression, anxiety, recurrent panic attacks, and social anxiety and currently being on methadone maintenance. Plaintiff reported being diagnosed with asthma, COPD, and bronchitis. Plaintiff reported being treated by Dr. Khot for one year, but Dr. Khot discharged Plaintiff from treatment due to excessive absenteeism. The provider recommended that Plaintiff begin individual therapy and referred Plaintiff for a psychiatric consultation.

**F.    Gibson Recovery Center, Inc.** (Tr. 1193-1201)

In March and April 2010, Plaintiff participated in group and individual counseling at Gibson Recovery Center after being admitted to the inpatient program. Plaintiff's probation officer referred him to Gibson after he tested positive for marijuana. Plaintiff reported a 24-year history of marijuana use and an 8-year history of alcohol abuse. Plaintiff reported asthma as his medical issue, and that his drinking and drug use resulted in estrangement from his family and the loss of his job. The provider noted that Plaintiff participated and cooperated in the group and individual sessions. Plaintiff was successfully discharged from the program.

**G.    Metro Treatment Center - Dr. Thymos Lambrou** (Tr. 1553-85, 1593-94)

From June 3, 2011, through June 15, 2012, Dr. Lambrou treated Plaintiff for opiate dependence at a methadone clinic. Plaintiff listed boating, camping, fishing, swimming, and taking walks with his father as his leisure activities, but he noted that lack of transportation and money affected how he spent his leisure time. Plaintiff listed staying active and looking for employment as part of his normal daily activities. Plaintiff received daily methadone injections.

### I. Other Record Evidence

#### 1. Disability Determination Explanations (Tr. 82-103)

On January 31, 2012, Disability Determination Explanations were completed at the initial level. Dr. Elissa Lewis, Ph.D., assessed Plaintiff's mental abilities. Dr. Lewis found no restrictions of Plaintiff's activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Plaintiff had not had any repeated episodes of decompensation of extended duration. Assessing Plaintiff's physical abilities, Lori Moyers, a single decision-maker,[4] concluded that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and stand, sit, or walk each for a total of six hours in an eight-hour day. Plaintiff could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. Plaintiff could not climb ladders, ropes, or scaffolds. Plaintiff did not have any manipulative, visual, or communicative limitations. Plaintiff's environmental limitations required him to avoid even moderate exposure to extreme cold, extreme heat, and humidity, and to avoid concentrated exposure to vibration and hazards.

#### 2. Case Analysis (Tr. 1191)

The Disability Determination Explanations were reviewed on September 11, 2012, in a Case Analysis completed by Dr. Carmen Fratto, a pulmonary specialist, who noted Plaintiff had a history of asthma and COPD, but there was insufficient information for assessing the severity of those impairments. Dr. Fratto also noted that Plaintiff had a history of low back pain, but

---

[4]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of a single decision-maker under proposed modifications to disability determination procedures). See also Shackelford v. Astrue, 2012 WL 918864, at (E.D. Mo. Mar. 19, 2012 ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

there was insufficient information for assessing the severity of that impairment.  Dr. Fratto explained that an orthopedic examination and lower spine x-rays would be necessary to assess the severity of Plaintiff's low back pain.

## IV.    The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012.  (Tr. 16)  Plaintiff has not engaged in substantial gainful activity since April 30, 2008, the alleged onset date.  The ALJ found Plaintiff has the severe impairments of asthma, chronic obstructive pulmonary disease ("COPD"), degenerative disc disease of the thoracic spine, degenerative disc disease of the lumbar spine, osteoarthritis of the right shoulder, depression, panic disorder, and substance abuse, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 16-17)  The ALJ found that Plaintiff has the residual functional capacity to perform light work except Plaintiff  can occasionally climb stairs, ladders, ropes, or scaffolds; he should avoid concentrated exposure to temperature extremes, humidity, strong odors, fumes, dusts, chemicals, or other respiratory irritants; he should not work around hazards, such as unprotected heights, or dangerous moving machinery; and he is limited to simple, routine, repetitive tasks with only superficial interaction with the public or co-workers.  (Tr. 19)  The ALJ noted that "[t]he residual functional capacity conclusions reached by the medical consultants employed by the State Disability Services also supported a finding of 'not disabled.'" (Tr. 33)  The ALJ found Plaintiff is unable to perform any past relevant work.  (Id.)  Plaintiff has at least a high school education and is able to communicate in English.  (Tr. 34)  The ALJ found that, considering Plaintiff's age, education, work experience, and residual functional capacity,

there are jobs existing in significant numbers in the national economy he could perform

including a laundry worker, a mail clerk, and an assembler of small parts.  (Id.)  The ALJ

concluded Plaintiff was not disabled within the meaning of the Social Security Act at any time

from April 30, 2008, the alleged onset date, through the date of the decision.  (Tr. 35)


**V.	Discussion**

To be eligible for DIB and SSI, Plaintiff must prove that he is disabled.  Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs.,

955 F.2d 552, 555 (8th Cir. 1992).  Under the Social Security Act, a disability is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§

423(d)(1)(A); 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability

"only if his physical or mental impairment or impairments are of such severity that he is not only

unable to do his previous work but cannot, considering his age, education and work experience,

engage in any other kind of substantial gainful work which exists in the national economy."  42

U.S.C.

§§ 423(d)(2)(A); 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an

ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether

the individual is engaged in "substantial gainful activity."  If he is, then he is not eligible for

disability benefits.  20 C.F.R. § 404. 1520(b).  If he is not, the ALJ must consider step two which

asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, he is not eligible for disability benefits. If the claimant has a severe impairment, the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed, or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed, or is not the equivalent of a listed impairment, the ALJ proceeds to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, he is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will he be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

This Court's review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir.

1998).  The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the claimant's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ relied on the opinion of a non-medical source.  As explained below, the Court concludes that the ALJ inadvertently relied on a non-medical source in rendering his decision.  Accordingly, a remand is appropriate to permit the ALJ to correct this error. Plaintiff also argues that the ALJ failed to properly consider whether his asthma met a listing level impairment.[5]

---

[5]Plaintiff's contention that the ALJ erred in not finding he met Listing 3.03 is without merit. See 20 C.F.R. Pt. 404, Subpt. P, Appx. 1.  It is undisputed that Plaintiff's FEV1 reading does not satisfy Listing § 3.03.  Thus, the undersigned must determine whether Plaintiff's breathing impairment satisfies Listing § 3.03B.  This requires that Plaintiff have asthma "[a]ttacks (as

A.     **Residual Functional Capacity**

Plaintiff contends that the ALJ erred by relying on the opinion of a non-medical source and failing to cite a medical source in support of his determination.

The ALJ made the following determination regarding Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant should avoid concentrated exposure to temperature extremes, humidity, strong odors, fumes, dusts, chemicals, or other respiratory irritants. The claimant should not work around hazards, such as unprotected heights, or dangerous moving machinery. The claimant can occasionally climb stairs, ladders, ropes, or scaffolds. The claimant is limited to simple, routine, repetitive tasks with only superficial interaction with the public or co-workers, meaning the claimant should primarily deal with things instead of people as the job tasks.

(Tr. 19)

The Regulations require an ALJ to "explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist." 20 C.F.R. § 404.1527(f)(2)(ii). A medical consultant must be an "acceptable medical source" identified in 20 C.F.R. § 404.1513(a)(1), (a)(3-5), that is, a licensed physician,

_____

defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year ... and an evaluation period of at least 12 consecutive months must be used to determine the frequency of the attacks." 20 C.F.R. Pt. 404, Subpt. P, Appx.1, § 3.03B. Medical evidence submitted in support of a claim of disabling asthma "must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained " 20 C.F.R. Pt. 404, Subpt. P, Appx.1, § 3.00C.

The medical record shows Plaintiff did not have "six attacks" within a twelve month period. Likewise, the medical evidence in the instant case fails to show Plaintiff adhered to "a prescribed regimen of treatment" and that he continued to suffer asthma attacks "in spite of" such treatment. The evidence shows otherwise. Plaintiff consistently failed to adhere to his regimen of treatment, by failing to take his medication or to cease smoking. Treatment records show that Plaintiff was often described as noncompliant with his medication. When complaint with his medication, Plaintiff reported improvement in his breathing.

a licensed optometrist, a licensed podiatrist, or a qualified speech-language pathologist. 20 C.F.R. § 404.1616(b). Only acceptable medical sources can provide medical opinions. Sloan v. Astrue, 499 F.3d 883, 889 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(a)(2)).

A disability Plaintiff's RFC is the most he or she can do despite his or her limitations. Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Moore, 572 F.3d at 523 (quoting Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006)).

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer v. Apfel, 245 F.3d 700, 704 (quoting Singh v. Apfel, 222 F.3d 448, 551 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, noting that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the

determination of the claimant's RFC.").

A single decision-maker "will make the disability determination after any appropriate consultation with a medical or psychological consultant." 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also Shackleford v. Astrue, 2012 WL 918864, *3 n.5 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted). A single decision-maker is not considered a medical source. See Gaston v. Astrue, 2012 WL 304685, *2 (W.D. Mo. July 25, 2012). See also Kettering v. Astrue, 2012 WL 3871995, *21 (E.D. Mo. Aug. 13, 2012) (finding that ALJ did not err by failing to specify weight accorded opinion of "single decision-maker" as "single decision-maker" was a disability counselor and not an acceptable medical source as defined by the regulations). It is error for an ALJ to consider a Physical Residual Functional Capacity Assessment ("PRFCA") by a single decision-maker. See Andreatta v. Astrue, 2012 WL 18547449, at *10 (W.D. Mo. May 21, 2012) (remanding case in which ALJ may have relied on PRFCA completed by a single decision-maker and referencing an agency policy that ALJs are not to evaluate in their opinions assessments by single decision-makers). See also Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (remanding case in which ALJ relied on non-physician's functional limitations, mistakenly believing that the examiner was a physician).

Here, the ALJ noted that "[t]he residual functional capacity conclusions reached by the medical consultants employed by the State Disability Services also supported a finding of 'not disabled.'" (Tr. 33) The residual functional capacity conclusions are contained in the Disability Determination Explanations found in Exhibits 1A and 2A. (Tr. 82-103) Exhibits 1A and 2A are

substantially similar. Exhibit 1A relates to Plaintiff's DIB claim; Exhibit 2A relates to Plaintiff's SSI claim. Each Disability Determination Explanation provides separate physical and mental RFC assessments. The physical RFC assessments are electronically signed by Ms. Lori Moyers, a single decision-maker with no indication of any medical credentials. The mental RFC assessments are electronically signed by Elissa Lewis, Ph.D. Each document is again signed at the end by both Ms. Moyers and Dr. Lewis. Giving the benefit of the doubt to Plaintiff, the undersigned construes the ALJ's remarks that he relied on the RFC from the State Disability Services to indicate that the ALJ mistakenly considered Ms. Moyers - a single decision-maker - as a medical source, and relied on her physical RFC analysis in determining Plaintiff's RFC.

The record shows that Dr. Lewis assessed Plaintiff's mental abilities and provided an opinion as to Plaintiff's mental RFC in the Disability Determination Explanations at the initial level. Ms. Moyers, a single decision-maker, assessed Plaintiff's physical abilities and provided a physical RFC conclusion in the Disability Determination Explanations at the initial level. These Explanations were reviewed in the one-page Case Analysis completed by Dr. Fratto. In the Case Analysis, Dr. Fratto did not discuss or affirm the opinions of Dr. Elissa Lewis (Psychiatric Review Technique) and Lori Moyers (PRFCA) set forth in the Disability Determination Explanations. It does not appear that Dr. Fratto reviewed or concurred with Ms. Moyers' findings in the PRFCA. Further, Dr. Fratto did not provide any residual functional capacity conclusions, so he cannot be the second medical expert the ALJ references in his determination. Hence, it appears that the ALJ inadvertently erred in relying on the opinion of the single decision-maker. See Ivey v. Colvin, 2013 WL 5217026, *10 (E.D. Mo. Sept. 17, 2013); Andreatta, 2012 WL 1854749, *10 (holding remand required when ALJ relied on the opinion of

single decision-maker, even if the RFC would be permissible absent consideration of single decision-maker's report).

Although the Commissioner correctly notes that Disability Determination Explanations were signed by both Dr. Lewis, a state reviewing psychologist, and Ms. Moyers, a single decision-maker, the undersigned cannot, on the present record, agree with the Commissioner's conclusion that Dr. Lewis' signature makes the single decision-maker's opinion a medical opinion. The undersigned notes that the Disability Determination Explanation forms have separate signature blocks for the Residual Functional Capacity and Psychiatric Review Technique and separate signature blocks at the end of the form for "MC/PC or SDM Signature" and "Disability Adjudicator/Examiner Signature." In contrast to the cases[6] cited by the Commissioner, these signature blocks at the end of the form do not evidence that Dr. Lewis reviewed the single decision-maker's opinion, affirmatively endorsed the opinion, or affirmed or adopted the single decision-maker's opinion. Compare Thongleuth v. Astrue, 2011 WL 1300074 (D. Kan. April 4, 2011) (medical consultant affirmed and adopted opinion of single decision-maker as his own); Jones v. Astrue, 2008 WL 1766964 (S.D. Ind. 2008) (affirming ALJ's reliance on a single decision-maker decision where decision was reaffirmed entirely by a physician's opinion, which the ALJ could weigh appropriately as a consulting medical opinion). Unlike the other case cited by the Commissioner, Northern v. Astrue, 2011 WL 720763, at *5 (E.D. Ky. 2011) (single decision-maker assessment was affirmed and adopted by a second state agency consultant and physician), in the instant case, there are no other opinions by physicians,

[6]The cited cases from jurisdictions other than the Eastern District of Missouri are not binding on this Court. See Hood v. United States, 342 F.3d 861, 864 (8th Cir. 2003) (holding that district courts in the Eighth Circuit are bound to apply Eighth Circuit precedent).

consulting or examining, who adopted the opinion of the single decision-maker.

Further, there is no opinion in the voluminous record from any physician regarding Plaintiff's work-related limitations. The record shows that Plaintiff did not undergo a consultative physical examination. Objective testing showed degenerative changes in Plaintiff's lower thoracic spine, minimal discogenic disease, and mild degenerate spondylosis. Plaintiff's back pain was treated with narcotic pain medications. Objective testing also showed chronic obstructive pulmonary disease with benign granulomatous changes and scattered pulmonary infiltrates. Plaintiff's respiratory impairments have been treated with medications. In addition, the ALJ found that Plaintiff had the severe impairment of osteoarthritis of the right shoulder. There is no opinion from any physician regarding how these impairments affect Plaintiff's ability to work.[7]

The ALJ has the duty to develop the record. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The ALJ is required to re-contact medical sources or may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004).

The ALJ found that Plaintiff's degenerative disc disease of the thoracic spine, and osteoarthritis of the right shoulder to be severe impairments. The ALJ's analysis of the evidence was thorough and comprehensive. Because the ALJ inadvertently relied on a non-medical source, there is no opinion in the record from any physician regarding the physical aspects of Plaintiff's work-related limitations. Stated differently, there is no opinion from any medical

---

[7]As noted by Plaintiff's counsel, Dr. Fratto opined that the severity of Plaintiff's asthma could not be determined without spirometry testing and the severity of Plaintiff's low back pain could not be determined wihtout an orthopedic evaluation.

source regarding how Plaintiff's severe physical impairments affect his ability to work. Thus, the ALJ's RFC determination as it relates to Plaintiff's physical limitations is not supported by substantial evidence.

Accordingly, the undersigned finds that the decision of the Commissioner must be reversed, and this matter remanded so that the ALJ can obtain medical evidence addressing Plaintiff's ability to function in the workplace, and reassess Plaintiff's residual functional capacity.

The Court is mindful of the possibility that Plaintiff might well not be disabled within the meaning of the Act. Because of the inadvertent reliance on a non-medical opinion, the ALJ's decision is not supported by substantial evidence on the record as a whole. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and that the case be **REMANDED** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further consideration consistent with this Memorandum and Order. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this __18th__ day of September, 2015.

_/s/ John M. Bodenhausen_
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE